CARPENTER *vs.* THE EASTON AND AMBOY RAILROAD COMPANY.

| 24 | 249 |
|---|---|
| 54L | 563 |
| 24 | 249 |
| 51 | 353 |
| 24 | 249 |
| 57 | 393 |

1. Under an award by commissioners, appointed to appraise and estimate the value of lands about to be taken for a railroad, and assess the damages, the presumption of law is that damages were awarded the owner for all injuries that might result to him. For injuries not considered by the commissioners, no adequate remedy can be had at law.

2. Where, at the time of making an award for damages for lands taken by a railroad company, the representatives of the company stated to the commissioners that they would cross certain low lands by an iron bridge, resting upon posts, and would protect and keep clear a lane—the only convenient means of communication between different parts of a farm—but subsequently the company determined to construct a high embankment and have commenced it, and intend to fill in and cut off the lane entirely, it clearly appearing that the commissioners did not consider the embankment in the estimate of damages; equity will restrain the company from filling up the lane, until compensation is made to the owner of the lands.

3. The Court of Chancery has power to determine in such case the amount of compensation.

4. It was referred to the commissioners, who made the original estimate and appraisement of damages, to estimate and report the proper amount of compensation.

5. An agreement, executed by the owner of the lands, to abide by the award, and that such agreement should be a bar to any proceeding to set aside or call in question the award, or the right and title of the company to the lands, and a bar to any objection to the validity or regularity of

the award, is no bar to the relief; the assurances of the company's agents,. confirmed by the character of the work already commenced at the time of. the execution of such agreement, being that the bridge was to be the plan pursued.

6. Nor is it a bar to the relief, that the owner of the lands had no faith that a bridge was to be built, but believed that the company intended to build the embankment, and so insisted before the commissioners. It clearly appears the commissioners confided in and acted on the representations of the company's agents. And they were further virtually repeated to the owner of the lands himself.

7. No implied contract to build a bridge, arises from the representations of a railway company's agents to the owner of lands, at the time of taking them for the purposes of their road, that they intend to cross the lands by means of a bridge.

Argued upon order to show cause why an injunction should not issue in accordance with the prayer of the bill.

*Mr. J. M. Robeson* and *Mr. Vanatta,* for complainant.

*Mr. Emery* and *Mr. T. N. McCarter* for defendants.

THE CHANCELLOR.

The complainant files his bill for relief against the act of the defendants in constructing the embankment for their railroad across his farm in Warren county, in such manner as to deprive him of a lane—a convenient farm way—over his land. The farm contains about one hundred and fifty-nine acres. Part of it lies on, and the rest near the Pohatcong creek. It is about a mile in length. The complainant resides upon it. The buildings are at the upper end. The railway crosses the property about a quarter of a mile from the upper end of the farm. The proposed embankment will be for part of the way about one hundred and twenty feet in heighth. The company intend to leave no passage-way through it on the complainant's land where his present farm-way is, but offer to make one for him in a part of the land where the embankment is of no very great height. This will be on the high ground, and will, he insists, be so steep as to

Carpenter *v.* Easton and Amboy R. R. Co.

be comparatively useless to him. They offer also, instead of this, to provide him the means of communication, partly by means of the public highway, outside of the farm, between the two portions of his property separated by their embankment. Both of these proposed substitutes would be much less convenient than his present means of communication, which is by the lane or road-way through the farm.

The defendants are a corporation formed by the consolidation of two companies, The Bound Brook and Easton Railroad Company and The Perth Amboy and Bound Brook Railroad Company. The act authorizing the consolidation, provides that the consolidated company is in all respects to act and be governed by the laws then in force respecting The Bound Brook and Easton Railroad Company, so far as the same are applicable. *Pamph. L.*, 1872, *p.* 1018.

The defendants, by their charter, are authorized to survey, lay out, and construct a railway from Phillipsburg to Perth Amboy, and to take by condemnation the requisite land for the purpose. The charter provides that the three commissioners, to be appointed thereunder in case of the failure of the company and land owner to agree, shall, having first been sworn, meet at the time and place appointed, and proceed to view and examine the land, at the same time taking into consideration all the benefits of the railway to the owner, and make a just and equitable estimate and appraisement of the value of the land and assessment of the damages to be paid by the company. Their report is to be in writing, under the hands and seals of the commissioners, or of any two of them, and is to be filed within ten days thereafter, together with the description of the land, and their appointment and oaths or affirmations, in the clerk's office of the county in which the land is situate, to remain of record therein. The charter further provides that the report, or a copy thereof, certified by the clerk of the county, shall at all times be considered as plenary evidence of the right of the company to have, hold, use, occupy, possess, and enjoy the land, or of the owner

to recover the amount of the valuation, with interest and costs, in an action of debt, in any court of competent jurisdiction, in a suit to be instituted against the company if they shall neglect or refuse to pay the same for twenty days after demand made of their treasurer, and shall from time to time constitute a lien upon the property of the company in the nature of a mortgage. The charter gives an appeal to the company and owner to the next Circuit Court of the county in which the land is situated.

The defendants surveyed, laid out, and located their road through the complainant's farm, dividing it into two parts, and in such a manner as to leave all the farm buildings, with only about eighteen acres of land, on the east or upper side of the railway; and the rest, about one hundred and thirty-seven acres, without buildings, on the other side thereof. All the farm buildings are on the northeasterly corner of the farm, in the valley, and near the creek, and near, also, as complainant alleges, to a valuable never-failing spring of water, the only water on the farm, except the creek, on which part of the farm lies. The greater part of the farm is high ground, lying more than one hundred and twenty feet above the bottom land.

The bill states, that the complainant has not, and has never had any other means of access to any part of his farm, except to one field, in the rear of which he has had access by a public highway; that to all other parts of the farm, he has had access by the lane or way above referred to, which, commencing near the public road, near the complainant's house, runs by his barn, along the north face of the hill, in a westerly direction, gradually ascending the hill to a point where the surface of the land admits of it, and then changing its course, southerly, passes through the farm, between a tier of fields on each side, to the most southerly enclosure of the farm. That, by that way alone, he has hauled all his fertilizers on his fields, and all his crops from them, and has passed to and fro in cultivating the land. That, through that lane, his cattle have passed at will to and from the creek,

for water; and that, in that connection, it is of great value to him, inasmuch as there is no water on the farm besides the creek and the spring above mentioned. The complainant alleges, that to deprive him of this lane will work irreparable damage to him, greatly depreciating the value of his property; will necessitate the erection of new buildings for that part of the property lying west of the railroad, and the consequent re-arrangement of the farm; which erection and adjustment will cost him from $6000 to $8000; and that, besides, the present buildings will be left with too small a quantity of land to be tilled to advantage, and he will thus be subjected to further great loss. It is unnecessary to pursue the complainant's statement of the injury which will be occasioned to him by the construction of the embankment, as proposed by the defendants.

In the summer of 1872, the parties having failed to agree as to the value of the land to be taken for the railroad, and the complainant's damages by reason of the taking thereof, commissioners were appointed, under the charter, to make an estimate and appraisement. They awarded to the complainant $2132, for damages, in addition to the value of the land taken. The complainant, being very much dissatisfied with the award, was about to appeal from it, but was induced by the company to abandon his intention, and execute a release to them, by the payment, by them to him, of the further sum of $500, and their agreement to provide a suitable protection upon any bridge which they might erect over any lane or crossing of the complainant, over the land mentioned in the award, against the dropping of coals from their engines, and to build a certain side track, of which he was to have the use. The $500 were paid; and the complainant, on or about October 28th, 1872, executed with the company, an agreement, by which he covenanted and agreed with them to accept and abide by the award or report, and thereby did accept the same; and that that agreement might be pleaded and set up as a defence, answer, or bar to any application, action, complaint, or proceeding, to set aside, remove, or call

in question, the said award or report, or the right and title of the company to have and to hold the lands therein referred to under the same ; and that, in any action, suit, or proceeding wherein the validity of said award, report, or proceedings to condemn should come in question, said agreement should be a full and perfect defence and bar to any objection made to the validity or regularity of the same. The company, on their part, covenanted to build the side track referred to, and give the complainant the privilege of using it, and to protect him and his property, as above mentioned, against the falling of coals from their engines.

It may be stated, that the charter of the company provides that it shall be the duty of the company, when their railroad shall intersect any farm or lands of any individual, to provide and keep in repair suitable wagon-ways over or under the railroad.

It satisfactorily appears, that when the commissioners were upon the land for the purpose of making the estimate and appraisement of the value of the land taken by the company, and the complainant's damages in that connection, it was stated to the commissioners, on behalf of the company, that it was the company's intention to cross the low lands of the complainant, and the creek, not by an " earth fill," but by an iron bridge six hundred feet in length, the ends to rest on stone abutments, and the body of the bridge to be supported by iron columns resting on stone bases ; and that the bridge, instead of being a damage to the complainant, would rather be an ornament, and would be no serious obstruction to the view down the valley, and would not interfere with his use of his land, nor seriously interfere with or disarrange more than two of his fields, leaving the rest of the farm in the same condition in which it then was. And the place, a point about forty feet southerly from the lane, where the southerly abutment of the bridge was to be located, was then pointed out, and on the complainant's suggesting that the abutment, being so near the lane, the " fill " would fall into the lane, it was replied, on behalf of the company, that they

would build wing walls, to keep the lane clear and prevent the earth from falling into it. It further appears, that when the settlement above referred to was made, the company seemed to be carrying out their design as communicated to the commissioners; that they had already begun to excavate for the foundation of the abutment in the place designated, and contractors were delivering stone for that structure. After the agreement of settlement had been executed, the company abandoned their design of bridging the valley, and determined to cross it by means of an embankment, which, although more expensive than the bridge, was regarded by their engineers as preferable. They proceeded to carry out this design, and had progressed so far in it, when the bill was filed, as to threaten, by their work, to fill up the lane in question, which they intended to close up with the embankment.

The complainant seeks relief in the premises. His bill prays that the defendants may be perpetually enjoined from setting up, pleading, proving, or in any way using the award or the agreement as a bar, release, qualification, limitation or abandonment of the complainant's right to have the lane or farm-road, at the place where it is crossed by the railroad, free and unobstructed, and properly preserved and protected for use in connection with and as a means of communication with and between the different parts of his farm; and that it may be decreed that neither the award or agreement is an obstacle, bar, or impediment to the complainant, his heirs or assigns, in possession of his farm, to being protected in the absolute possession, and free and safe use and enjoyment at all times, forever hereafter, of the lane in its present location; and that the company may be restrained from obstructing or unnecessarily interfering with the lane or the complainant's use of it.

The representations made in behalf of the company, at the time of the meeting of the commissioners on the land, were of such a character as very materially to influence the minds of the commissioners, in fixing the damages to be awarded to

the complainant. It was proper that the commissioners should know to what use the company proposed to put the land. To have assumed that the company intended to make an embankment there, which would cut off communication between the upper and lower parts of the complainant's farm, when such was not the design of the company, but the contrary, might have been unjust to the company. It is true, the representatives of the company might have declined to make any statement on the subject. In that case the commissioners would have been at liberty to conclude that justice to the complainant demanded the most liberal award of damages, on the ground of the greatest injury which it was at all probable the company would do him by the work. But the representatives of the company did not decline to answer, when appealed to on the subject. They stated what the design of the company was, in regard to the complainant's land. It was quite different from that which has been substituted in its stead. The company took from the complainant's farm, a strip of some four hundred feet in width, which they were at liberty to occupy with an embankment, and thus to have divided his property into two parts; but their plan, as communicated to the commissioners, involved no immediate irreparable injury to him or his property. It was said, in the representations alluded to, that the bridge would last probably fifty years. So that it was reasonably to be presumed that for many years at least, the company's work would prove no very serious detriment to the complainant's property. That the award of damages was made in view of these statements, appears conclusively by the affidavits of the commissioners. It is sufficient to refer to that which is appended to the answer—the affidavit of Caleb Swayze. He says, the commissioners, believing the statements of the engineers of the company in the matter to be true, and to express their honest intentions, made their award on the basis that the company intended to do as their agents represented; and the commissioners considered the possibility of an embankment

being made, to be too remote and uncertain, to be made the subject of damages.

That the company's plan still was to bridge the valley when the agreement of settlement was made, is evident from the covenant on their part contained in that agreement to provide a suitable protection upon any bridge which they might erect over any lane or crossing of the complainant over the land mentioned in the award, against the dropping of coals from the engines of the company. They had not then changed their intention as to the mode of carrying their track over the valley. Having subsequently done so, and having substituted for their original method one far more injurious to the complainant, especially in that it will deprive him of convenient communication between the upper and lower parts of his farm, the question is, what is the effect of this change upon the parties? The complainant's counsel insist that, from these representations, an implied contract on the part of the company' has arisen to cross the valley by means of the bridge, which they ought to be decreed specifically to perform, and that relief was asked for on the argument. But the bill is not filed for specific performance of such alleged contract, nor any contract. It prays no such relief, nor is such relief fairly within its scope. Besides, in my judgment, no contract is to be implied from these representations. But I am of opinion that, inasmuch as by means of them no damages were awarded to the complainant in respect of his being deprived of this means of convenient communication, the company should not be permitted to deprive him of that communication without compensating him therefor.

The company insist that the complainant had no confidence in the representations, but insisted before the commissioners that, notwithstanding their statements, the company did intend to cross the valley by means of an embankment, and they contend that he cannot, therefore, claim to have been injured by statements or representations, which he not only did not believe, but in which he expressly declared his want of

confidence. To this, it may be said, that the damages of the complainant were not appraised by himself, but by the commissioners. It is, therefore, far more important to know whether they confided in, and acted on the representations to the complainant's injury, than whether the complainant gave credence to the statements. It appears they did.

But it is said, that when he made the settlement he was acting for himself, and had control over the whole subject, and if his want of confidence in the representations existed then, it will debar him from any relief in the premises. It appears that he had great reason to believe in the representations at that time, for the work on the abutment had been commenced, and was in progress; and, besides, the covenant on the part of the company above referred to, shows that the representations were then substantially repeated to him. It is not reasonable to suppose that, under such circumstances, he could have failed to believe the truth, or that he could have had doubts as to the intentions of the company, so palpably evidenced as they were by the work alluded to, and their covenant contained in the agreement of settlement, to protect him and his property against injury by fire falling from their engines through the bridge.

The more important question is, as to the extent of the relief and mode of administering it. The complainant insists, that the company should be absolutely enjoined from filling up the lane, and should be left to acquire the right to fill it, by proceedings under the charter, as for condemnation, or as best they may. He insists that they have never acquired the right to close up the lane. By the charter, it is enacted that the report of the commissioners, or a duly certified copy thereof, shall, at all times, be considered as plenary evidence of the company's right to have, hold, use, occupy, possess, and enjoy the lands. By the proceedings of condemnation, under the charter, the company acquired title to the land for their purposes, and the presumption of law is, that damages were awarded for all injuries to the means of communication between the different parts of the farm.

*Ellsworth* v. *Central R. R. Co.*, 5 *Vroom* 94, 95. The complainant can have no adequate remedy in the premises at law. He is entitled to compensation for the injury which the company intend to do him, and they ought not to be permitted to inflict it upon him until they have made him just compensation therefor. This court, however, will not, under the circumstances, permit the consequences of the injurious representations to extend beyond reasonable indemnity. It is the duty of this court, in view of the magnitude and importance of the enterprise in which the company are engaged, and the great pecuniary interests involved in it, which must be injured by prolonged delay in the execution of the part of the work in controversy, to see to it that, while justice is done to the complainant, no unnecessary injury is inflicted upon the defendants. In their answer, the company tender themselves ready to make such increased compensation to the complainant, to be ascertained in such manner as this court shall direct, as he would have been equitably entitled to, had the present intention of the company, as to the embankment, been entertained and made known to the commissioners when the award was made. This offer is equitable. In my judgment, all that the complainant is fairly entitled to, is such indemnity. The estoppel should not be carried beyond the limits of the injury. *Phillipsburg Bank* v. *Fulmer*, 2 *Vroom* 52, 55; *Wheeler* v. *Rochester and Syracuse R. R. Co.*, 12 *Barb.* 227. Had there been no representations inducing the commissioners to estimate and appraise the damages on the presumption that the company would cross the complainant's land with their track by means of a bridge, or had they not considered the probability that the company would cross by an embankment too remote to enter into their consideration, as they did in consequence of the representations made on the subject by those who acted for the company, the commissioners would, it is to be presumed, have awarded the complainant a sufficient amount to compensate him for all damages. That they did not do so, is attributable to the company. The injury

which the complainant has sustained, is measured, and will be compensated for, by an amount of money equal to the difference. This he is entitled to in equity, and he is entitled to no more. The company should be restrained from obstructing the lane until they shall have made him compensation. This court has power to determine the amount they should pay him.

The order to show cause will, therefore, be made absolute, unless the defendants shall make the complainant such increased compensation in the premises as this court shall deem reasonable and just. The amount of that compensation will be estimated by the commissioners, by whom the value of the land and damages were estimated and appraised, and reported to this court for approval.